[No. 12729.  Department Two.  December 11, 1915.]

## B. L. GATES, *Respondent*, v. HUTCHINSON INVESTMENT COMPANY *et al., Appellants.*[1]

LANDLORD AND TENANT — LEASE — CONSTRUCTION — DURATION OF TERM. Where a lease to a subtenant provided that the lessor "does by these presents lease, let and demise" certain portions of the leased premises, "for the full term" of two years and nine months, and that the lessor "further agrees to rent" the premises to the lessee for an additional term of three years at a specified increased rental, and "further agrees to rent" the same for an additional two years at a further increased rental, and in which the tenant agreed to pay the rent and quit the premises at the end of "said term," the lease must be construed as one for the term of two years and nine months, with renewal options for the additional terms, in view of the evident intent of the parties as gathered from the whole instrument, and the fact that the two renewal periods called for rental payments in the sum of $70,000, the obligation for which was nowhere clearly expressed; since in case of ambiguity or doubt, the lease must be construed most strongly against the lessor.

SAME. The fact that, in another clause, the lessor agreed that, if his own term expired and he should get another lease, the lessee may have another lease "if he so elect," is not sufficient to remove the ambiguity.

Appeal from a judgment of the superior court for King county, Ronald, J., entered March 19, 1915, upon findings in favor of the plaintiff, in an action for an injunction, tried to the court. Affirmed.

*Preston & Thorgrimson, Hastings & Stedman,* and *Hartman, Nafe & Hartman,* for appellants.

*Kerr & McCord* and *Griffin & Griffin,* for respondent.

[1]Reported in 153 Pac. 322.

BAUSMAN, J.—The Hutchinson company, being itself a lessee for a much longer term, had sublet a storeroom to Mrs. Knettle, whose period was to expire on the 1st day of March, 1915. Long before Mrs. Knettle's term was to run out it made a more extensive sublease to respondent, Gates, the greater part of which instrument we find it necessary to set out, with such portions italicized as are made pertinent here by the construction sought to be put upon it by both parties. It was executed April 20, 1912, the lessor being the first party and Gates the second.

". . . Witnesseth: That the said lessor *does by these presents lease, let, and demise* unto the said lessee those two certain storerooms in the first story of that certain building known as the Estabrook building, situated on the southeast corner of Second avenue and Union street, in Seattle, King county, Washington, which storerooms are known and described as Nos. 1326 and 1328 Second avenue, Seattle, Washington, together with that portion of the basement thereunder lying west of the wall running north and south through the center of said building, *for the full term of two years and nine months* from the first day of June, A. D. 1912, to the last day of February, A. D. 1915, at the monthly sum or rental of seven hundred dollars ($700) per month, *and provided that M. L. Knettle*, who now occupies said storeroom No. 1328 Second avenue, *shall deliver over possession of the said store room now occupied by her* to the party of the first part, as hereinafter provided for, *before the last day of February*, A. D. 1915; *then the rental* for the said premises from and after the time when said M. L. Knettle shall so deliver over the said storeroom No. 1328 Second avenue to the party of the second part until the first day of March, A. D. 1915, shall be the sum of one thousand dollars ($1,000) per month.

"*The party of the first part further agrees to rent the* said premises hereinbefore described *to the party of the second part for the additional term of three years* beginning on the first day of March, A. D. 1915, to and including the last day of February, 1918, at the monthly rental of twelve hundred dollars ($1,200) per month, *and further agrees to rent* the said premises hereinbefore described *to the party of the*

*second part for an additional two years* beginning on the first day of March, A. D. 1918, to and including the last day of February, A. D. 1920, at the monthly rental of thirteen hundred and fifty dollars ($1,350) per month; each and all of said rents to be payable monthly in advance.

"It is expressly agreed and understood that the said lessee accepts this lease subject to the lease now in force between the party of the first part, lessor, and one M. L. Knettle, who is occupying the storeroom No. 1328 Second avenue, Seattle, Washington, under a lease by which said M. L. Knettle is to pay the sum of three hundred dollars ($300) per month, and the said M. L. Knettle shall continue to pay said rental to the party of the first part, lessor, for the said premises, and *at the termination of the lease* made by the party of the first part *to the said M. L. Knettle,* at any time hereafter, *the party of the first part agrees to deliver possession to the party of the second part of the premises therein leased to said M. L. Knettle, and second party agrees to then accept said premises and to pay the rent herein provided.*   .   .   .

"It is further agreed and understood that the party *of the first part shall furnish, at its own cost, reasonable steam heat* to the party of the second part, to comfortably warm the premises hereby leased, free of charge to the party of the second part, during the term of this lease.   .   .   .

"It is further agreed and understood by and between the parties hereto that, should the party of the first part, or its assigns, continue to lease or control the premises now included in the present lease under which it leases the premises herein described for a longer period than its present lease, *the party of the second part* shall have, and is hereby granted, *if he so elect, the right to lease the said premises herein described for such additional time* as the party of the first part, or its assigns, shall occupy or control the same, at the same average rental per front foot as other stores in the Estabrook Building rent for.   .   .   .

"It is further covenanted and agreed that if any rents shall be due and unpaid, or if default shall be made in any of the covenants hereby and herein to be kept, then it shall be lawful for the said lessor to terminate and annul this lease and reenter the said premises and remove all persons therefrom, *and the said lessee does hereby expressly covenant promise and agree to pay said lessor the said rent in the*

*manner and at the times hereinbefore specified, and at the*
*expiration of said term to quit* and surrender the said prem-
ises in as good state and condition as the reasonable use and
wear thereof will permit, damage by the elements, fire and
earthquake excepted. . . ."

Gates, taking possession, continued until the last day of
February, 1915, when, having paid all the rents to that date
as they accrued, he vacated the whole of his portion.  Before
he abandoned the premises he notified the Hutchinson com-
pany that he would do so, and his vacating the premises was
over its objection and assertion of a contrary obligation.
After this date the Hutchinson company assigned its lease
to the appellant trust company, whereupon Gates, apprehend-
ing suits by both the Hutchinson company and the trust com-
pany, brought, and successfully maintained in the lower
court, this action for a perpetual injunction against the as-
sertion or collection of rents for any further period.

A solitary question is presented to us: Did Gates' lease
terminate on the last day of February, 1915?  The appel-
lants' contention is that it ran until the last day of Febru-
ary, 1920.  To express it otherwise, was there one long term,
or a single short one with options for more?  Did Gates, in
April, 1912, bind himself to 1920 or only to 1915?  The
lower court held with Gates, and we think was right in do-
ing so.

It is conceded by appellants that, no matter what tech-
nical terms may be found in this instrument, the intention
of the parties is to prevail when the document is read as a
whole.  We must, therefore, note to begin with that, if Gates
was to be bound until 1920, it was easy to say so in the first
italicized portion, and to make that *the* term.  Then could
have been inserted the varying rates for the different periods.
Thus, instead of saying there that the landlord "does lease,
let, and demise for the full term of two years and nine months
. . . to the last day of February, 1915," it was natural
to say, "until the last day of February, 1920, the rent for

the first two years and nine months being" so much, the rent for the next three years so much, and for the next so much.

This way of expressing the thing was so natural to a conveyancer that the failure to word it thus is not to be overlooked. The parties did not express it that way. Instead, they not only expressed themselves in very distinct periodic grants, but also changed the form of the granting words. Thus, for the first and undisputed two years and nine months, the landlord "does lease, demise and let," but when it comes to the later terms, he "agrees to rent."

This change is too marked not to be noticed, and, in our opinion, tended to leave in the tenant's mind the idea of renewal option. Appellants, against this, cite authorities holding "agrees to let" words of present demise. Assume this, and yet the other conceded rule is that intention gathered from the whole shall prevail. Now, the money difference between the landlord's and the tenant's construction of this lease amounts to about $70,000 against the tenant. Those who seek so enormous an increase surely should establish it by language not doubtful.

He upon whom the law imposes the burden in doubt must accept the loss from ambiguity. Is not the present an instance for the established rule that dubious words favor the tenant, a rule applicable to the specific question involved here, that of renewal and doubtful length of term?

Taylor, in Landlord and Tenant (9th ed.) § 81, cited with approval in *Kaufmann v. Liggett*, 209 Pa. St. 87, 58 Atl. 129, 103 Am. St. 988, 67 L. R. A. 353; and *Winston-Salem Masonic Temple Co. v. Union Guano Co.*, 162 N. C. 87, 77 S. E. 1106, has summed it up as follows:

"If there is any real ambiguity the doubt must be settled against the lessor, for 'it is the general rule, in construing provisions of a lease relating to renewals, where there is any uncertainty, that the tenant is favored, and not the landlord, because the latter having the power of stipulating in his own favor, has neglected to do so.' "

As we expressed it ourselves in a question of length of term in *Boston Clothing Co. v. Solberg*, 28 Wash. 262, 68 Pac. 715:

" 'When the instrument is silent as to the party who is· to exercise the right to determine, the lessee only has the option of determining the lease at the specified time, on the principle that where the words of a grant are doubtful, they must be construed most strongly in favor of the grantee. McAdam, Landlord and Tenant (2d ed.), p. 186.' "

Those were, to be sure, cases of the tenant's claiming a longer and not a shorter term, but the rule of favoring the tenant is as applicable where he seeks relief as where he asserts extension. Such ambiguities, resulting from the whole instrument, must be resolved against the landlord. The law has adopted this as a policy.

We have seen in what doubtful words the landlord, beyond the first two years and nine months, bound himself. Look, now, to the language by which Gates was bound to pay. This we find only in the last italicized portion, where he agrees to pay rent for "said term." To no term had he in plain English bound himself, except the first—the two years and nine months, which was what the landlord in that passage had described as the "full term," and by the only indisputable words of present "leasing, letting, and demising." The other terms were, in our opinion, only renewal options. Counsel for appellants, indeed, did in argument retort upon this construction by saying that, if the options had been exercised, would the landlord then have been excused in these later periods from furnishing the tenant steam heat? His argument was that, if that obligation was running through all the years against the landlord, then was not the rent running against the tenant through these later periods as well as through the first two years and nine months; that is to say, if the words "said term" meant by the tenant's construction only the first two years and nine months, then the heating obligation would be confined to the first two years and nine

months also; and that, this interpretation being unreasonable, the tenant's own construction of the language as to the term must turn against him? Our answer to this is that, if, as we think, the expressions "further agrees to let" for the later periods were but renewal privileges, then, when these privileges were exercised and the additional term accepted by the tenant, they created new terms with mutual obligations of the old, and that, as in cases of direct renewal rights, it was not found necessary to repeat all the mutual covenants of the original term.

Nor do we overlook appellants' argument, drawn from that italicized portion which is next to the last italicized. There, when the lessor's own term should expire and it should get a new lease, Gates, it is provided, may have another lease from the landlord if he so *elect*. At this point in the instrument, when the term of Gates did at all events expire, the optional word is clearly employed. Why, it is argued, was the optional word not employed at the other pauses or breaks between the alleged renewal periods? The most that can be said of this argument is that it aids the landlord a little. It does not, in our opinion, aid him substantially. The ambiguity remains with the preponderance of language in this instrument, as well as the policy of the law, favoring the tenant. We find, in short, no sufficient warrant in any argument offered to us to increase so enormously the burdens of the tenant in this contract.

The decree is affirmed.

MORRIS, C. J., HOLCOMB, MAIN, and PARKER, JJ., concur.