[No. 26781.   *En Banc.*   April 22, 1938.]

THE NATIONAL BANK OF COMMERCE OF SEATTLE *et al.,*
*Appellants,* v. ARTHUR G. DUNN, *Individually*
*and as Executor, Respondent.*[1]

[1]Reported in 78 P. (2d) 535.

Kerr, McCord & Carey (*Anthony Kane,* of counsel), for appellants.

*Donworth, Paul & Donworth, Roberts & Skeel,* and *W. E. Evenson,* for respondent.

BEALS, J.—The National Bank of Commerce of Seattle and George C. Wheeler, as trustees of a trust established by the will of Mattie A. Thomas, deceased, instituted this action against 'Arthur G. Dunn, individually and as executor of the will of his late wife, Jeanette W. Dunn, for the purpose of recovering judgment for rent, which the plaintiffs claimed to be due under a lease of business property in the city of Seattle. The trust in question was the subject of the action of *Thomas v. National Bank of Commerce,* 187 Wash. 521, 60 P. (2d) 264, but no question presented

in this action was considered in the former suit.

Defendant having answered, an amended reply was filed, and additional relief was requested in a supplemental complaint, to which defendant answered. The defendant admitted liability in the sum of $3,916.24, together with $19 accrued costs, paying the aggregate amount into court for the benefit of plaintiffs, and the action was tried to the court sitting without a jury. Findings of fact and conclusions of law in defendant's favor were entered, followed by a judgment awarding plaintiffs the amount which defendant admitted owing, and denying plaintiffs any further relief. From this judgment, plaintiffs have appealed.

Error is assigned upon the refusal of the trial court to make findings of fact and conclusions of law requested by appellants; upon the making of the findings and conclusions signed by the court; upon the refusal of the court to award appellants judgment for any amount in excess of that which respondent admitted owing; and upon the entry of judgment for that sum only.

It appears that Mattie A. Thomas (then Mattie A. Phillips), during the month of August, 1909, was the owner of a tract of real estate located at the southwesterly corner of Third avenue and Stewart street, in the city of Seattle. August 10, 1909, Mattie A. Thomas, by an instrument in writing, leased the land to Cline Piano Company, a corporation, for the term of fifty-one years, from August 1, 1909, at an annual rental of $12,600, payable $1,050 on the first day of each calendar month, beginning January 1, 1911.

The lessee took possession of the property, improved the same by erecting thereon a building, as it had agreed to do, and June 24, 1912, assigned its interest in the lease to Virginia Investment Company, a corporation; the lessee's interest finally becoming vested

in Arthur G. and Jeanette W. Dunn, by assignment dated May 25, 1928. This assignment was accepted by Mr. and Mrs. Dunn on the day following its date, the trustees under the Thomas will giving their consent thereto. It is admitted that Mr. and Mrs. Dunn took possession of the premises as owners of the lessee's interest in the lease, and that this interest was their community property.

Over two years prior to the assignment to the Dunns, Mattie A. Thomas died, leaving a will, which was thereafter probated before the superior court for King county; and December 31, 1926, the lease in question, with other property of her estate, was distributed, to be held in trust according to the terms of her will. At the time of the commencement of this action, the appellants herein, The National Bank of Commerce of Seattle and George C. Wheeler, were acting trustees under the Mattie A. Thomas will, and were entitled as such to institute and maintain this action.

September 7, 1929, Jeanette W. Dunn died, her will was probated, and the appointment of respondent Arthur G. Dunn as executor thereof was confirmed by the court. In this opinion, by respondent we mean Mr. Dunn, personally and as executor. The respondent admitted that he held possession of the demised premises under the lease from the death of his wife until March 24, 1933, but denied that he had been in possession of the premises thereafter.

In their complaint, appellants alleged that Mr. Dunn had paid the rent up to and including November, 1932, but had made no payments thereafter, save the sum of $1,000, paid February 21, 1933. Appellants prayed for judgment for rentals aggregating $41,000, together with interest. By his answer, respondent admitted an indebtedness to appellants on account of rent in the sum of $3,916.24, but denied any further indebtedness.

By their supplemental complaint, appellants prayed for judgment for rent which had accrued after the institution of the action. Respondent alleged, by way of an affirmative defense, that March 24, 1933, he, individually and as executor of the will of his deceased wife, assigned his interest in the leasehold to Ansonia Improvement Company, a corporation; and that this corporation accepted the assignment and took possession of the property, thereby terminating all liability on the part of respondent for the further payment of rent.

It appears without dispute that respondent Arthur G. Dunn, together with his sons, Edward B. and Arthur G. Dunn, Jr., during the month of March, 1933, organized, under the laws of the state of Washington, a corporation called Ansonia Improvement Company, having a capital stock of five hundred shares of no par value, to which corporation the lease was later formally assigned. Appellants, in their amended reply, alleged that they had never consented to the assignment of the lease to the corporation (which will hereinafter be referred to as Ansonia), and that, in so far as appellants' claim for rent is concerned, the assignment to Ansonia nowise released respondent from an obligation under the lease to pay rent. At the time of the trial, appellants claimed rent in the aggregate sum of $48,300, with accumulated interest. Respondent admitted liability as above stated.

The trial court was of the opinion, as expressed in the judgment, that respondent's liability to appellants for rent under the lease referred to in the complaint herein was based solely upon privity of estate, and that the making of the assignment of the lease to Ansonia terminated all liability on the part of respondent for the payment of the rent called for by the lease. The first question, then, which may properly

be determined is whether or not the lease contains a covenant to pay rent, upon which respondent, as successor in interest of the original lessee, is still liable, by way of privity of contract, notwithstanding the assignment of the lease to Ansonia. Appellants contend that they never consented to or recognized that assignment, and that for other reasons the relationship between appellants and respondent was nowise changed thereby; that the original lease contains a covenant to pay rent; and that respondent, holding under the lease as successor in interest of the original lessee, is by privity of contract obligated to pay the rent which the lease calls for.

The original lease, after an opening paragraph containing the date and the names of the parties, continues:

"Witnesseth: That the said lessor, upon the terms, conditions and considerations hereinafter set forth, does hereby lease and demise unto the said lessee, their executors, administrators and assigns, those certain premises . . .

"For the term of fifty-one years from the 1st day of August, 1909, to and including the 31st day of July, 1960, at an annual rent of twelve thousand six hundred ($12,600) dollars per year, paid in the following manner:

"Five thousand two hundred and fifty ($5,250) dollars paid this day to the lessor, as five months advance rent up to the 1st of January, 1910 (receipt of which is hereby acknowledged). The rent for January, 1910, to be paid in advance.

"The lessor further agrees to grant lessee eleven months free rent beginning the first day of February, 1910, and ending December 31st, 1910, and thereafter the said annual rent is to be paid in monthly installments of one thousand and fifty ($1,050) dollars each, payable in advance on the first day of each calendar month beginning with January 1st, 1911, in gold coin of the United States of the present standard of weight and fineness, at such place in the city of Seattle as the

lessor may from time to time previously designate in writing, and in default of such designation, then on the leased premises.

"It is further expressly covenanted, understood and agreed between the parties hereto as follows:"

Here follow nineteen numbered paragraphs, the first providing for the deposit by lessee of five thousand dollars, to be returned when lessee should complete and pay for a, building, costing not less than fifty thousand dollars, to be constructed on the land covered by the lease; the second providing that, in case of forfeiture of the lease, "the damages, in so far as rents are concerned," should be in a stated amount. The third paragraph provides for the construction of the building referred to in the first paragraph; the fourth stating that the lessee should, at its own expense, maintain the improvements on the property in good repair, and that the lessee might, under certain circumstances, construct another building, if desired.

By the fifth paragraph, the lessee covenanted, promised, and agreed to pay before delinquency all taxes and assessments levied or assessed against the premises, certain assessments being expressly excepted. By this paragraph, the lessee also promised and covenanted to pay "all rates, revenue charges, levies general and special, ordinary and extraordinary, . . . water rates and insurance premiums," etc., against the premises. By the sixth paragraph, lessee agreed to keep the property insured; while by the seventh, it was agreed that the lessor should pay no interest on any deposit made by lessee under the lease.

By the eighth paragraph, the lessee agreed to promptly repair the building in case of damage thereto; and by the ninth, the lessee covenanted, promised, and agreed to indemnify and save harmless the lessor from

all liens for labor or material performed or furnished for the benefit of the premises. The tenth paragraph conferred upon the lessor the right to pay any lien or charge which might be established against her interest in the premises, the lessee covenanting to repay the same with interest; while, by the eleventh paragraph, the lessee covenanted that the premises should be used only for lawful purposes, and that it would, at its own expense, keep the building and appurtenances in a good, safe, and secure condition.

By the twelfth paragraph, it was provided that the improvements placed upon the property should belong to the lessor at the termination of the lease; and by the thirteenth paragraph, the lessor granted to the lessee an option to purchase the property according to a fixed schedule of prices. The fourteenth, fifteenth, and sixteenth paragraphs covered the matter of defaults under the lease and covenants of ownership by the lessor. The seventeenth and eighteenth paragraphs read as follows:

"(17) The terms and conditions of this lease are binding upon and shall inure to the benefit of the respective heirs, executors, administrators and assigns of the parties.

"(18) The lessee is expressly given the right to assign this lease, and if the assignee is acceptable to the lessor, then all liability of the lessee after such acceptance of the assignee by the lessor shall cease, and the lessor agrees that as soon as said fifty-thousand ($50,-000) dollars building specified in paragraph one (1) of this lease has been constructed, paid for, and is ready for occupancy in accordance with this lease, then the Cline Piano Company may assign this lease to the Cline Building Company, provided said Cline Building Company is duly organized as a corporation and qualified to do business in the state of Washington, and provided further the said Cline Piano Company shall still remain liable upon such bonds as it may have given for the performance of this lease."

The nineteenth paragraph has no possible bearing upon any question in this case.

Appellants first contend that Mr. and Mrs. Dunn, as owners of the lease, by privity of contract under an alleged inferred covenant to pay rent, became personally obligated to pay the rent called for by the lease, and were never released from that obligation. The lease does not contain an express covenant to pay rent. That the parties well knew how to state such a covenant, clearly appears, as the lessee covenanted to pay taxes, to repay money paid by the lessor on account of liens or charges established against her interest, and to do or refrain from doing other things specifically mentioned. The lease also contains an express covenant on the part of the lessor.

It is, then, at the outset, significant that the lessee did not expressly covenant to pay rent. It is true, as argued by appellants, that no precise language is necessary to create a covenant to pay rent, and that the existence of such a covenant may be inferred from a consideration of the language of the entire instrument. It is also true that an inferred covenant to pay rent may be as comprehensive and binding as an express covenant. The lease was signed and acknowledged both by the lessor and by the lessee, a circumstance entitled to consideration in construing the instrument.

By the terms of the lease, the lessee agreed to construct upon the demised land, at its own expense, a brick building, at least three stories in height, to cost not less than fifty thousand dollars, the building to become the property of lessor at the end of the period covered by the lease, or sooner if the lease should be terminated in any other manner. The lessor, then, at the time the lease was made, had reason for believing that, once the building was constructed and paid for, the lessor's position under the lease was reasonably

secure. Apparently, the building was erected and paid for according to the agreement, the building producing a considerable income.

In the absence of a covenant to pay rent, one holding possession of demised premises under a written lease reserving rent comes under a concurrent obligation to pay rent, and the successor in interest of a lessee, holding by assignment, while in possession of the premises, by reason of the doctrine of privity of estate, incurs the obligation to pay rent during actual occupation of the premises. Such a lessee or his successor in interest, however, if, under the lease, it be held that the lessee made no express covenant to pay rent, may transfer the lease and be free from any further obligation thereunder (assuming the lessee's right to assign).

Under a lease which contains an express covenant or agreement to pay rent, the lessee is not released from such obligation by assigning the lease, unless, of course, some act on the part of the lessor be held to have operated to change the obligation which originally existed between the parties. These propositions are discussed in 36 C. J. 373, § 1228 *et seq.*, and in 16 R. C. L. 844, § 344 *et seq.*

A lease containing an express covenant to pay rent was considered by this court in the case of *Johnson v. Goddard*, 179 Wash. 493, 38 P. (2d) 208, and the texts above cited were referred to.

In the case of *Huston v. Graham*, 169 Wash. 521, 14 P. (2d) 44, it was held, in an action for the recovery of rent due under a written lease, which provided: "*The lessee to pay* rent for said premises during the first ten year period thereof, in the sum of $1800.00 per annum," the lessee was obligated to pay the rent, the court stating that "No precise language is necessary to create a promise or covenant, the intention

may be gathered from the whole instrument." It was also held that the original lessee was still liable for the payment of rent, in spite of the fact that the lessee had assigned his interest under the lease, the lessors not having consented to the assignment nor released the original lessee.

Appellants rely upon the *Huston* case, as well as upon the case of *Johnson v. Goddard, supra,* contending that the lease here in question so nearly resembles the leases which were brought before the court in the cases cited that those decisions are here controlling. Appellants also rely upon the cases of *Johnson v. Norman,* 98 Wash. 331, 167 Pac. 923, and *Medgard v. Shimogaki,* 135 Wash. 527, 238 Pac. 574. The case of *Puget Mill Co. v. Kerry,* 183 Wash. 542, 49 P. (2d) 57, 100 A. L. R. 1220, is also cited.

Appellants particularly rely upon the case of *Samuels v. Ottinger,* 169 Cal. 209, 146 Pac. 638, Ann. Cas. 1916E, 830, twice cited by this court, in which the supreme court of California held that a covenant to pay rent need not be a promise in exact words, but may be inferred from language necessarily importing an undertaking on the part of the lessee to pay the rent called for by the lease, the court saying:

"Whether there be a contract to pay rent must depend on whether such contract is to be found in the words of the lease, giving such words a fair and reasonable interpretation."

The California court held that, by the lease then before it, the lessee covenanted to pay the rent therein called for.

In construing a lease in a controversy between lessor and lessee, the lease will be construed against the lessor. *Gates v. Hutchinson Inv. Co.,* 88 Wash. 522, 153 Pac. 322. The same rule should apply in a controversy

between a lessor and one who holds as successor in interest to the lessee.

In the case of *Samuels v. Ottinger, supra,* it appeared that the lessor sued the lessee named in the lease, who had assigned the same and contended that his obligation under the lease had terminated. The supreme court of California held that, considering the entire contract in the light of the rule above quoted, the lessee had contracted to pay the rent called for by the lease, and was liable thereon. While there is some similarity between the lease considered by the California court in the case cited and the lease now before us, the former contained language not present in the lease which is the subject matter of this action, and as each lease must be construed upon its own language, the decision of the California court, while of interest and to some extent supporting appellants' position, is not directly in point.

In the case of *Huston v. Graham, supra,* this court, in holding the original lessee liable upon a lease as upon a covenant to pay rent, referred to the following language of the lease: "First, *the lessee to pay* rent for said premises during the first ten year period thereof, in the sum of $1800.00 per annum." Concerning this language, we said:

"The language 'the lessee to pay rent' is plain, and has a prominent place in the written instrument. Surely, it expresses and means something, and we are not at liberty under the guise of construction to convert that something into nothing. The words must not be destroyed altogether, nor forgotten. Someone is to pay rent. Who? The lessee, because the writing says so. What less or different could be intended by that language than that John Graham, named and who signed as lessee, promised and agreed to pay the rent? No precise language is necessary to create a promise or covenant, the intention may be gathered from the whole instrument."

In the later case of *Johnson v. Goddard, supra,* in holding the original lessee liable under the lease for the payment of rent, we quoted extensively, from the lease, calling particular attention to the fact that it was

" '. . . *mutually agreed* by and between the lessors and the lessee that this lease is made upon the following terms and conditions, to-wit:

" 'First. The rent to be paid for said premises for said term of ninety-nine years·shall be the sum of One Hundred Dollars ($100) per month for each and every month during the first five years of said term; the sum of One Hundred Twenty-five Dollars ($125) for each and every month for the next or following ten years; the sum of One Hundred Fifty Dollars ($150) per month for each and every month during the balance of said term of this lease. *All of said monthly rentals to be paid monthly in advance on the first day of each and every month at such place as the lessors shall in writing designate.'* (Italics ours.)"

Following the case of *Huston v. Graham, supra,* we held that, under the contract of lease, the lessee was liable for the payment of rent. The lease contained language wanting in the lease now before us, and which language was properly construed as a covenant to pay rent.

The case of *Gates v. Hutchinson Inv. Co., supra,* should be studied in connection with the questions here to be determined. Hutchinson, itself a lessee for a long term, made a sub-lease to Gates. The latter contended that this sub-lease expired in February, 1915, when he vacated the premises. He later brought suit, seeking a perpetual injunction against Hutchinson and its assignee, restraining the defendants from attempting to collect rents for any further period. The defendants contended that the lease ran until February, 1920. A decree in plaintiff's favor was here affirmed. The doctrine that "the intention of the

parties is to prevail when the document is read as a whole," was approved. ˙ This court observed that, "if Gates was to be bound until 1920, it was easy to say so in the first italicized portion, and to make that *the* term." Considering this portion of the language of the lease, the court said:

"This way of expressing the thing was so natural to a conveyancer that the failure to word it thus is not to be overlooked. The parties did not express it that way. Instead, they not only expressed themselves in very distinct periodic grants, but also changed the form of the granting words. Thus, for the first and undisputed two years and nine months, the landlord 'does lease, demise and let,' but when it comes to the later terms, he 'agrees to rent.'

"This change is too marked not to be noticed, and, in our opinion, tended to leave in the tenant's mind the idea of renewal option. Appellants, against this, cite authorities holding 'agrees to let' words of present demise. Assume this, and yet the other conceded rule is that intention gathered from the whole shall prevail. Now, the money difference between the landlord's and the tenant's construction of this lease amounts to about $70,000 against the tenant. Those who seek so enormous an increase surely should establish it by language not doubtful.

"He upon whom the law imposes the burden in doubt must accept the loss from ambiguity. Is not the present an instance for the established rule that dubious words favor the tenant, a rule applicable to the specific question involved here, that of renewal and doubtful length of term?

"Taylor, in Landlord and Tenant (9th ed.) § 81, cited with approval in *Kaufmann v. Liggett,* 209 Pa. St. 87, 58 Atl. 129, 103 Am. St. 988, 67 L. R. A. 353; and *Winston-Salem Masonic Temple Co. v. Union Guano Co.,* 162 N. C. 87, 77 S. E. 1106, has summed it up as follows:

" 'If there is any real ambiguity the doubt must be settled against the lessor, for "it is the general rule, in construing provisions of a lease relating to renewals,

where there is any uncertainty, that the tenant is favored, and not the landlord, because the latter having the power of stipulating in his own favor, has neglected to do so." '

"As we expressed it ourselves in a question of length of term in *Boston Clothing Co. v. Solberg*, 28 Wash. 262, 68 Pac. 715:

" ' "When the instrument is silent as to the party who is to exercise the right to determine, the lessee only has the option of determining the lease at the specified time, on the principle that where the words of a grant are doubtful, they must be construed most strongly in favor of the grantee. McAdam, Landlord and Tenant (2d ed.), p. 186." '

"Those were, to be sure, cases of the tenant's claiming a longer and not a shorter term, but the rule of favoring the tenant is as applicable where he seeks relief as where he asserts extension. Such ambiguities, resulting from the whole instrument, must be resolved against the landlord. The law has adopted this as a policy."

In the case at bar, the lease contains no express covenant to pay rent. The lessee did, however, expressly agree to construct a fifty thousand dollar building upon the property. The lessee also covenanted, promised, and agreed to pay before delinquency all taxes and assessments (with certain specified exceptions), and in the same paragraph the lessee further

". . . promises, covenants and agrees to pay all rates, revenue charges, levies general and special, ordinary and extraordinary, of every kind, nature and description, water rates, insurance premiums for fire and indemnity insurance, which may be levied, assessed, imposed upon or charged against the said premises or any buildings or improvements which may be placed thereon, and any and all taxes, charges and assessments which may be levied or imposed upon either said leasehold interest or the reversionary interest, it being the purpose and intent and it being specially covenanted, promised and agreed that such payments shall be made throughout the term of this

lease by the lessee, so that the said rent shall be paid to the lessor net and over and above all charges of any and all kinds whatsoever, save and except those hereinafter specially excepted and agreed to be paid by the lessor."

The covenant last quoted is particularly clear and positive, the intention of the parties that the lessee be bound being stated beyond peradventure of a doubt. It clearly appears, then, that when, in accordance with the understanding of the parties, the lessee was to make certain payments, the parties embodied that agreement in language which admits of no misunderstanding. While it may be unusual that a lease which contains no covenant to pay rent does contain a covenant to pay taxes, and it may well be argued from this fact that, if the language of the entire lease would admit of such a construction, a covenant to pay rent should be inferred, nevertheless the absence of such an express covenant is so significant that the failure to include the same cannot be overlooked. As was said in the opinion of this court in the case of *Gates v. Hutchinson Inv. Co., supra:* "This change is too marked not to be noticed."

In this connection, the historical background of the question here presented is of interest. It is well stated in 1 Tiffany, Landlord and Tenant, 1029, § 171, in which attention is called to the difference between privity of estate and privity of contract in the following language:

"Express covenants. The reservation of rent upon the making of a lease does not, strictly speaking, involve any contractual liability on the part of the lessee. At common law the land was regarded as owing the rent created by the reservation, and the lessee owed the rent merely by reason of his tenancy of the land, that is, as it is ordinarily expressed, by reason of his 'privity of estate.' This liability on his part, as we shall see later, was asserted by an action of debt, which

was not properly a contractual action, but rather an action to recover money belonging to the plaintiff and withheld by the defendant. In other words, while the land was regarded as the original debtor, the tenant could be charged as pernor or taker of the profits by means of an action of debt.

"Though the landlord thus had a right of recovery against the lessee on the privity of estate, the practice arose, in comparatively modern times, of inserting in the instrument of lease an express covenant by the lessee to pay the rent, thus imposing on the lessee a liability by reason of 'privity of contract.' There is ordinarily such a covenant at the present day, and, in fact, informally drawn instruments quite frequently contain the language of a covenant for rent, without any language expressly reserving the rent. In such case the words of covenant do duty as words of reservation of the rent as well as of a covenant to pay it."

Certainly, the matter of the payment of something over a thousand dollars a month by way of rental under a lease for fifty years was of such importance that, if the negotiations between the parties had crystallized into an agreement that the lessee would, by the lease which was to be executed, covenant to pay rent during the entire term, the contract would have been clearly expressed in the lease. The instrument gives evidence of having been carefully prepared. Discussion of its various terms and provisions and of the decided cases which bear on one side or another of the question now under discussion might be prolonged almost indefinitely. We conclude, after careful consideration, that the lease contains no covenant to pay rent, express or inferred, and that the trial court did not err in holding that respondent's liability under the lease is based upon privity of estate only, and not upon privity of contract.

■ ■ We shall now discuss the matter of the assignment of the lease by respondent to Ansonia. In the

early case of *Tibbals v. Iffland,* 10 Wash. 451, 39 Pac. 102, the plaintiff, as lessor under a lease originally made to one Trapeur, which had been assigned to Iffland, and by Iffland assigned to one Barnett, sued Iffland, seeking judgment for rent which had accrued after the assignment from Iffland to Barnett. On appeal by plaintiff from an adverse judgment rendered on the verdict of a jury in favor of defendant, this court held that an instruction to the effect that Iffland had a lawful right to assign the lease for the purpose of avoiding the obligation to pay rent, was "substantially in accord with the authorities." In the course of the opinion, this court said:

"Appellant contends that without notice the assignment was ineffectual as to him. But the authorities appear to be the other way. The law applicable to this, as well as the preceding instruction, is stated by Wood in his valuable treatise on Landlord and Tenant, *supra,* in these words:

" 'The assignee may rid himself of all liability *to the lessor* for rent, and the covenants in the original lease, by reassigning the lease to any person. He may do this without giving notice to the lessor, or obtaining his leave; and, notwithstanding a covenant in the original lease that the lessee, his executors or administrators, should not assign without the license of the lessor. There is no fraud in the assignee of a lease re-assigning his interest with a view to getting rid of the lease; hence he may re-assign it to a beggar, or a married woman, or a person leaving the kingdom for the express purpose of relieving himself of liability under the covenants. It is not even necessary that the person to whom the re-assignment is made should take possession of the premises, or assent to the lease. In one case it was held that a re-assignment of a lease might be lawfully made to a prisoner in a Fleet, who was paid a sum of money to accept of the assignment.' "

It does not appear that the rule laid down in the *Tibbals* case has ever been departed from, and it is

undoubtedly the law that an assignee of a lease, liable thereon by privity of estate only, may, in the absence of an independent covenant rendering him liable thereon, assign the lease and stand free of obligation thereunder. In the case of *Puget Mill Co. v. Kerry,* 183 Wash. 542, 49 P. (2d) 57, 100 A. L. R. 1220, it appeared that the assignee had by his own contract bound himself to fulfill the terms of the lease. The general doctrine as above stated is supported by the decision of the circuit court of appeals for the ninth circuit, in the case of *Madden v. La Cofske,* 72 F. (2d) 602, 95 A. L. R. 370, and the authorities therein referred to. The principle is also stated in 16 R. C. L. 864, § 367.

We shall now consider the matter of the effect of the assignment to Ansonia, as presented by the record before us. Mr. and Mrs. Dunn executed a joint will, which, after her death, was regularly admitted to probate. The will provided that upon the death of either testator, all of the property of the spouses should go to the survivor, to use and enjoy, sell or encumber, during his or her life, and that upon the death of the survivor, the undisposed portion of the property should go to a trustee, to be administered under a trust for the benefit of the five children of the parties in equal shares. Respondent has been acting as executor of this will.

As above stated, respondent Arthur G. Dunn, together with his two sons, Edward B. and Arthur G., Jr., during the month of March, 1933, organized, under the laws of the state of Washington, a corporation called Ansonia Improvement Company, having a capital stock of five hundred shares of no par value (of which respondent took 447 shares, Arthur, Jr., two shares, and Edward B., one share, fifty shares not having been issued) and a minimum paid-in capital of five hundred dollars, which amount Mr. Dunn paid into the treasury of the corporation. Under

date March 24, 1933, respondent, individually and as executor, assigned to this corporation his interest in the leasehold which is the subject matter of this action. The corporation, Ansonia, was regularly organized pursuant to the laws of this state, and appellants were by respondent promptly advised of the assignment of the lease to the corporation. At the date of the assignment, there was due, under the lease by way of rent, the sum of $3,200. The taxes for the year 1932, amounting to almost $9,000, were due, although not delinquent. These taxes were later paid out of the income from the property, and respondent admitted liability for the rent which had accrued prior to the assignment, and paid the amount thereof into court for the benefit of appellants.

Examination of the record convinces us that appellants never accepted Ansonia as their tenant under the lease, and that they at all times regarded respondent as their tenant. Respondent owned all but three shares of the outstanding capital stock of the corporation, one son owning two shares and the other, one. During the month of December, 1936, respondent assigned eighty-eight shares of the capital stock of the corporation to each of his five children, being the beneficiaries of the trust created by the joint will of himself and his wife, reserving seven shares for himself. The ownership of the corporate stock then stood as follows: Arthur G. Dunn, seven shares; Arthur G. Dunn, Jr., ninety shares; Edward B. Dunn, eighty-eight shares; Jeanette G. Jackson, eighty-eight shares; Dorothy A. Bailey, eighty-eight shares; Maurice S. Dunn, eighty-eight shares.

Appellants contend that Ansonia was merely the *alter ego* of respondent, and that the assignment of the lease to the corporation did not relieve respondent of the obligation to pay rent, the possession of the

property by Ansonia being, in fact and in law, the possession of respondent. On the other hand, respondent contends that, by the assignment of the lease to Ansonia, respondent terminated his liability under the lease for the payment of rent, and that, under the rule laid down in *Tibbals v. Iffland, supra,* he stands clear of all liability to appellants. By respondent, we include, when appropriate, Mr. Dunn, individually and as executor.

The exact question here presented is one of first impression in this jurisdiction, and is of considerable importance. The record clearly shows that respondent assigned the lease to Ansonia in an attempt to escape responsibility for the payment of rent under the lease. Times were hard, and the lease was not then profitable, although at some future time it might become so. At the time of the assignment and until December, 1936, respondent owned practically all the stock of Ansonia, and any profit which the lease might earn would, of course, inure to his benefit. The transaction was carried out perfectly openly, and it does not appear that any facts were concealed, a clear-cut question of law being here presented.

It is well established that an assignment of a lease in order to terminate any privity of estate on the part of the assignor, must be a *bona fide* assignment, and not one which is fraudulent or merely colorable. The rule is well stated in 16 R. C. L. 866-7, § 369, as follows:

"Fraudulent or Colorable Reassignment. If the reassignment is not colorable merely, the assignee may relieve himself from subsequently accruing liabilities, without regard to the intent with which the reassignment is made and irrespective of the financial condition of the person to whom the reassignment is made. . . . But if the assignment is merely colorable, that is, if it is made to conceal the title of the assignor therein while he continues to receive the benefits de-

rived from the use of the property, his liability for rent is not terminated thereby."

Here, of course, nothing was concealed, the fact that respondent would continue to receive any benefits which might be derived from the use of the property being perfectly apparent.

We are mindful of the fact that an assignee of a lease, not bound by privity of contract, may relieve himself of liability under the lease by assigning the same, even to a person who is entirely irresponsible. The question to be here determined is: Has any assignment actually been made, or has respondent simply passed the lease from one hand to the other, himself remaining at all times the actual owner thereof?

The organization of the corporation by respondent and the assignment of the lease thereto were subject to no legitimate criticism. The acts were not fraudulent, and probably several good reasons existed for proceeding after that manner. The organization of corporations is a perfectly legitimate method of carrying on business and owning property, the only question to be here considered being the effect of the organization of the corporation and the assignment of the lease thereto upon the relationship which existed between respondent and appellants.

Clearly, so long as respondent owned practically all of the capital stock of Ansonia, and Ansonia owned the lease here in question, respondent was the only person who could profit from the existence of the lease. He was the sole person beneficially interested therein. We are not here concerned with questions which might arise between any other persons on the one hand, and Ansonia, or respondent, on the other, or between such third persons and respondent and Ansonia jointly. We are here concerned only with the relationship existing between appellants, as lessors,

and respondent, as lessee, together with Ansonia, as respondent's assignee.

It is argued that respondent's intention always was to divide the capital stock of Ansonia among his five children, and that the considerable delay in making this division was due to problems which arose under statutes of the United States which affected respondent. Whatever the reason for respondent's delay in giving his children the corporate stock of Ansonia, we must take the record as we find it, the rights of the parties being determined by what actually was done.

Several cases have been decided by this court which have some bearing upon this phase of the case at bar. In the case of *Mitchell v. Lea Lumber Co.*, 43 Wash. 195, 86 Pac. 405, 9 L. R. A. (N. S.) 900, the plaintiff sought to recover damages resulting from driving shingle bolts down a river, and to enjoin the further use of the river for that purpose. It appeared from the evidence that the shingle bolts had, in fact, been driven by a corporation other than the defendant. It also appeared, however, that the defendant corporation controlled the boom company, and that the employees of the latter had been paid by the defendant. This court held that the defendant corporation was responsible for the acts of the boom company.

In the case of *Roberts v. Hilton Land Co.*, 45 Wash. 464, 88 Pac. 946, it appeared that the president of a corporation, who owned practically all of its capital stock, individually agreed to sell a tract of real estate. The corporation which actually owned the land refused to convey, and an action was brought against the corporation for specific performance. Judgment of the superior court in favor of the plaintiff was by this court affirmed. In the course of the opinion, Judge Dunbar, speaking for the court, said:

"Hilton made no distinction between his individual business and the business of the land company, and it does not make a particle of difference whether we consider the land as the property of Hilton or of the Hilton Land Company. In either event, it is the same land and the same owner, and the owner cannot escape responsibility by any such acts of legerdemain as are attempted by the appellant in this case. It will not be allowed to contract the land as Hilton's and then, when it rues the contract, plead the ownership of Hilton Land Company, and *vice versa.*"

In the case of *Spokane Merchants Ass'n v. Clere Clothing Co.*, 84 Wash. 616, 147 Pac. 414, an action for goods sold, it was held that goods sold to a retail store on order of the manager was, in fact, a sale to the defendant corporation. Judge Ellis, speaking for the court, said:

"Courts no longer hesitate to look through forms to substance, and ignore a mere colorable corporate entity to the end that rights of third parties shall be protected."

In the case of *Clark v. Schwaegler,* 104 Wash. 12, 175 Pac. 300, this court held that the corporate entity of a holding corporation should be ignored, the corporation being merely a nominal thing, the stockholders being the real parties in interest.

In the case of *Platt v. Bradner Co.*, 131 Wash. 573, 230 Pac. 633, this court said:

"It is also well settled law that, while, in general, a corporation is a separate legal entity, nevertheless when one corporation so dominates and controls another as to make that other a simple instrumentality or adjunct to it, the courts will look beyond the legal fiction of distinct corporate existence, as the interests of justice require; and where stock ownership is resorted to not for the purpose of participating in the affairs of the corporation in the customary and usual manner, but for the purpose of controlling the subsidiary company so that it may be used as a mere

agency or instrumentality of the owning company, the court will not permit itself to be blinded by mere corporate form, but will, in a proper case, disregard corporate entity, and treat the two corporations as one."

In the case of *DeLano v. Tennent,* 138 Wash. 39, 244 Pac. 273, 45 A. L. R. 766, it appeared that the holder by assignment of the lessee's interest under a lease, who had assumed the obligations of the lease, was not released from these obligations by the fact that the corporation which he had organized took possession of the premises and paid the rent therefor. This court said:

"The corporation which entered into possession of the premises was but his creature, and it entered under his direction and with his consent. As between the plaintiff and himself, therefore, the corporation was either his agent or his servant, and in either event he is answerable to the plaintiff for any wrongful injury done to the premises by the corporation."

In the course of the opinion in the case of *Sheffield Co. v. R. Hoe & Co.,* 173 Wash. 489, 23 P. (2d) 876, this court held that the trial court had correctly treated a family corporation as being merely the individuals who owned its capital stock.

In the case of *State v. Davies,* 176 Wash. 100, 28 P. (2d) 322, this court laid down the doctrine that

"One may not, by a corporate form of organization, or by utilizing a corporate entity, succeed in the attempt to evade a legal obligation or escape punishment for breach of a criminal statute."

Other decisions of this court having some bearing upon this question are *Johnson v. Norman,* 98 Wash. 331, 167 Pac. 923; *Associated Oil Co. v. Seiberling Rubber Co.,* 172 Wash. 204, 19 P. (2d) 940; *Wilson v. Washington Concrete Pipe Co.,* 178 Wash. 545, 35 P. (2d) 71; *Pohlman Inv. Co. v. Virginia City Gold Mining Co.,* 184 Wash. 273, 51 P. (2d) 363.

In the recent case of *Deno v. Standard Furniture Co.,* 190 Wash. 1, 66 P. (2d) 1158, it was held that, under the evidence, a question of fact for the jury was presented, as to whether or not one corporation was merely an instrumentality or conduit of another in the operation of a tenement house. The opinion in the case last cited is important in considering the phase of the case at bar now under discussion.

In the case of *McBee v. Sampson,* 66 Fed. 416, the United States circuit court, considering the matter of an assignment of a lease, used the following language:

"If this assignment be not *bona fide,* and be merely colorable,—that is to say, if it be made for the purpose of avoiding responsibility for rent already accrued, or to evade the performance of covenants they were bound, during their tenure, to perform, or if their assignee is simply a man of straw, who will hold for them,—then an assignment, made under such circumstances, would not free them from the responsibility."

In 89 A. L. R. 439, in the course of a lengthy annotation following a case involving the assignment of a lease, the doctrine is stated that,

"If the assignment is merely colorable, and the assignee, while attempting to get rid of the burdens of the leasehold estate, is endeavoring to retain its benefits, the assignment is fraudulent, and will not have the effect of relieving the first assignee from his liability to the lessor for rent accruing subsequently to the fictitious assignment [citations]; as, for instance, where the assignment is to the agent or the dummy of the assignor."

In 52 L. R. A. (N. S.) (1914) 989, in a discussion following a leading case involving the assignment of a lease, is found the following:

"Colorable Assignments. But if the assignment be colorable, that is, if it be a mere sham made to conceal the title of the assignor therein while he continues to

receive the benefits derived from the use of the property, his liability for rent is not terminated thereby."

It is interesting to note that these authorities stress the importance of the fact that the assigning tenant continues to receive the benefits derived from the use of the property. Clearly, in the case at bar, respondent would receive, through the medium of his corporation, Ansonia, any benefits which might accrue from the tenancy of the property covered by the lease.

In the case of *State ex rel. v. Standard Oil Co.*, 49 Ohio St. 137, 30 N. E. 279, 34 Am. St. 541, 15 L. R. A. 145, the supreme court of Ohio, in an action brought by the attorney general by way of *quo warranto* to oust a corporation from the exercise of its franchise, used the following language:

"The general proposition that a corporation is to be regarded as a legal entity, existing separate and apart from the natural persons composing it, is not disputed; but that the statement is a mere fiction, existing only in idea, is well understood, and not controverted by any one who pretends to accurate knowledge on the subject. It has been introduced for the convenience of the company in making contracts, in acquiring property for corporate purposes, in suing and being sued, and to preserve the limited liability of the stockholders, by distinguishing between the corporate debts and property of the company, and of the stockholders in their capacity as individuals. All fictions of law have been introduced for the purpose of convenience and to subserve the ends of justice. It is in this sense that the maxim *in fictione juris subsistit aequitas,* is used, and the doctrine of fictions applied. But when they are urged to an intent and purpose not within the reason and policy of the fiction they have always been disregarded by the courts. . . .

"No reason is perceived why the principles applicable to fictions in general, should not apply to the fiction that a corporation is a personal entity, separate from the natural persons who compose it, and for

whose benefit it has been invented. . . . The idea that a corporation may be a separate entity, in the sense that it can act independently of the natural persons composing it, or abstain from acting, where it is their will that it shall, has no foundation in reason or authority, is contrary to the fact, and, to base an argument upon it, where the question is, as to whether a certain act was the act of the corporation, or of its stockholders, cannot be decisive of the question, and is therefore illogical; for it may as likely lead to a false, as to a true result.

"Now, so long as a proper use is made of the fiction, that a corporation is an entity apart from its shareholders, it is harmless, and, because convenient, should not be called in question; but where it is urged to an end subversive of its policy, or such is the issue, the fiction must be ignored, and the question determined, whether the act in question, though done by shareholders, that is to say, by the persons united in one body, was done simply as individuals and with respect to their individual interests as shareholders, or was done ostensibly as such, but, as a matter of fact, to control the corporation and affect the transaction of its business, in the same manner as if the act had been clothed with all the formalities of a corporate act."

In the case of *McCaskill Co. v. United States,* 216 U. S. 504, 54 L. Ed. 590, 30 S. Ct. 386, the supreme court of the United States called attention to the fact that

"A growing tendency is therefore exhibited in the courts to look beyond the corporate form to the purpose of it and to the officers who are identified with that purpose;"

and the circuit court of appeals for the eighth circuit, in the case of *Majestic Co. v. Orpheum Circuit,* 21 F. (2d) 720, stated the doctrine that

"The corporation will be regarded as a legal entity as a general rule, and the courts acting cautiously and only when the circumstances justify it, will ignore the fiction of corporate entity, where it is used as a blind or instrumentality to defeat public convenience, justify

wrong, or perpetrate a fraud, and will regard the corporation as an association of persons."

In 1 Fletcher Cyc. Corporations 134, § 41, under the heading:

"The corporation may be disregarded as a form or a 'fiction' and the ultimate party regarded in law and fact, when necessary to the justice of the case,"

the matter is discussed, and the following rule stated in the case of *United States v. Milwaukee Refrigerator Transit Co.*, 142 Fed. 247 (opinion by Sanborn, J.), is quoted with approval:

"If any general rule can be laid down, in the present state of authority, it is that a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons."

Any advantage which might accrue to the lessee would benefit respondent. The profits would pass through a set of books kept under a name other than his, but always he stood by to receive any possible gain. We are convinced that the *alter ego* doctrine applies, and that the assignment of the lease to Ansonia did not operate to relieve respondent from liability for the payment of rent under the Thomas lease. Respondent was and remained, in the eye of the law, in so far as appellants were concerned, the sole party in interest as tenant under that lease, and it must be held that the transfer to Ansonia did not relieve respondent from the obligation to pay rent.

The fact that respondent, in assigning the lease to Ansonia, did so openly, and immediately informed appellants of his action, cannot, as argued by respondent, operate to respondent's advantage. As we have

stated, it may be assumed that he was at liberty to assign the lease to such a corporation if he desired to do so, but the fact that he did so openly, and that there was no fraud or concealment of any material fact, cannot change his relationship to the corporation and to appellants. The objection which appellants may urge to respondent's position is not that respondent wrongfully assigned the lease to Ansonia, but that he now contends that, because of such assignment, he is, from the date of the assignment, free from the obligation to pay rent.

When, however, respondent divested himself of the ownership of all but seven shares of stock in the corporation, a different situation at once arose.

By the terms of the agreement between Mr. and Mrs. Dunn, which became effective upon her death, it was provided that

"Upon the death of either of us the survivor shall have all of said property before named [which included the lease here in question] to use, own, enjoy, sell, lease or encumber and dispose of, during his or her life as the case may be, and upon the death of the survivor of us the unused and undisposed of portion of such property only shall go to the trustee hereinafter named for the uses and purposes hereinafter stated."

The lease, then, was subject to disposition by Mr. Dunn, and he had the right to assign the same to the corporation and to take the corporate stock as his own property. He also had the absolute right to dispose of the corporate stock as he pleased, and while he lived and the stock remained in his name, his children had no interest therein. The assignment of the shares of stock to respondent's children was, so far as the record discloses, made in good faith, and vested title to these shares in the children, respectively. Assuming, for the purposes of argument only, that the corporate stock was a portion of the Dunn estate, this

assignment took the shares out of the estate, and apparently the stock will never fall into the trust created by the joint will of Mr. and Mrs. Dunn. The transfer initiated new titles to the stock in Mr. Dunn's children for the number of shares conveyed to each of them, respectively. This is just as much a new title as though the stock had been transferred to strangers.

The disposal of his stock in Ansonia operated to terminate respondent's ownership of the lease. Respondent, then, was obligated to pay the rent only up to the date when he divested himself of the ownership of the stock in Ansonia.

Respondent contends that, because appellants filed no claim for rent with respondent as executor of his wife's will, this action as against the Dunn estate must fail. Respondent paid to appellants the rent due until long after Mrs. Dunn's death, which occurred September 7, 1929, and until sometime after the probate of her will, which was admitted to probate March 28, 1930. Under Mrs. Dunn's will, Mr. Dunn is, so far as this action is concerned, the sole owner of the leasehold. No occasion arose for the presentation of any claim for rent against Mrs. Dunn's estate.

The judgment appealed from is reversed, and the cause remanded, with instructions to proceed in accordance with the views herein expressed.

ALL CONCUR.